UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LUIS SOUSA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-40120-IT |
| | * | |
| SEEKONK SCHOOL COMMITTEE; RICH | * | |
| DROLET, in his personal and official | * | |
| capacities; and KIMBERLY SLUTER, in her | * | |
| personal and official capacities, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

January 20, 2023

TALWANI, D.J.

Plaintiff Luis Sousa alleges violations of his First and Fourteenth Amendment rights and the Americans with Disabilities Act rights by the Seekonk School Committee (the "School Committee"), Superintendent of Seekonk Public Schools Rich Drolet, and School Committee member Kimberly Sluter. Amend. Compl. [Doc. No. 27]. Pending before the court are Sousa's motions for preliminary injunctive relief. The first motion seeks to enjoin the School Committee and Drolet from enforcing a no trespass order. See Renewed Motion [Doc. No. 28].[1] The second motion seeks to enjoin the enforcement of portions of a School Committee policy concerning public participation. Motion for a Preliminary Injunction [Doc. No. 61]; "Public Participation at School Committee Meetings" policy ("Public Participation Policy") [Doc. No. 27-12].

---

[1] The Renewed Motion also sought emergency relief. On December 9, 2022, the court entered a Temporary Restraining Order ("TRO") [Doc. No. 54] discussed below, but that order has since expired. The procedural background in this case has been recounted in earlier orders, see Elec. Orders [Doc. Nos. 11, 20, 23, 31]; Temporary Restraining Order [Doc. No. 54].

Defendants oppose Sousa's motions. See Prelim. Opp. [Doc. No. 30]; Opp. to Renewed Motion [Doc. No. 41]; Opp. to Motion for a Preliminary Injunction [Doc. No. 82]. For the following reasons, Sousa's motion to enjoin enforcement of the no trespass order is allowed in part and denied in part and Sousa's motion to enjoin enforcement of portions of the School Committee policy is denied.

## I.      Background

The School Committee is a school committee organized pursuant to Mass. G.L. c. 41, § 1, and Mass. G.L. c. 71, §§ 1 and 37, in Seekonk, Massachusetts. See Amend. Compl. ¶ 2 [Doc. No. 27]; Amend. Answer ¶ 2 [Doc. No. 67]. It is a public body that holds regular and special meetings pursuant to Massachusetts' open meeting law, Mass. G.L c. 30A §§ 18-25. Drolet Aff. ¶ 3 [Doc. No. 16-1].

The School Committee has adopted a "Public Participation at School Committee Meetings" policy ("Public Participation Policy") [Doc. No. 27-12] pursuant to which members of the public may address the School Committee during public comments periods known as Public Speak. Drolet Aff. ¶ 4 [Doc. No. 16-1]. The Public Participation Policy provides in relevant part

> the [School] Committee would like the opportunity to hear the wishes and ideas of members of the Seekonk school community on matters within the scope of [the School Committee's] authority. These matters include the budget for the Seekonk Public Schools, the performance of the Superintendent, and the educational goals and policies of the Seekonk Public Schools.
>
> In order that all who wish to be heard before the [School] Committee have a chance and to ensure the ability of the [School] Committee to conduct the District's business in an orderly manner, the following rules and procedures are adopted consistent with state and federal free speech laws:
>
> 1.      At the start and end of each regularly scheduled School Committee meeting individuals and/or groups may address the School Committee during public comment periods, which shall be known as Public Speak . . .
>
> 2.       All speakers are encouraged to present their remarks in a respectful manner.
>
> 3.      . . . All remarks will be addressed through the Chair of the meeting.

. . . .

5.       . . . . Public Speak shall last no longer than (2) 15 minute periods.
Assuming that four (4) or fewer speakers sign up to engage in public
comment, each speaker will be allowed three (3) minutes each to present
their material. If five (5) or more speakers sign up to engage in public
comment, then each speaker will be allowed two (2) minutes each to
present their material. No more than six (6) speakers will be
accommodated at any individual public speak portion of the agenda unless
the Chair determines there is a good reason to extend the time allotted for
public speak.

. . . .

7.       Speakers may not assign their time to another speaker, and in general,
extensions of time will not be permitted unless the Chair determines there
is a good reason to afford an extension. However, speakers who require
reasonable accommodations on the basis of a speech-related disability or
who require language interpretation services may be allotted a total of five
(5) minutes to present their material. Speakers must notify the School
Committee by telephone or e-mail at least 48 hours in advance of the
meeting if they wish to request an extension of time for one of these
reasons.

8.       The Chair of the meeting may not interrupt speakers who have been
recognized to speak except that the Chair reserves the right to terminate
speech which is not constitutionally protected because it constitutes true
threats, incitement to imminent lawless conduct, comments that were
found by a court of law to be defamatory, and/or sexually explicit
comments made to appeal to prurient interests. Verbal comments will also
be curtailed once they exceed the time limits outlined in paragraphs five
and seven of this policy and/or to the extent they exceed the scope of the
School Committee's authority.

9.       Disclaimer: Public Speak is not a time for debate or response to comments
by the School Committee. Comments made at Public Speak do not reflect
the views or the positions of the School Committee. Because of
constitutional free speech principles, the School Committee does not have
the authority to prevent all speech that may be upsetting and/or offensive
at Public Speak.

Public Participation Policy [Doc. No. 27-12] (emphasis added).[2]

---

[2] The parties refer to these provisions as "rules." The Public Participation Policy [Doc. No. 27-
12] refers to them as "rules and procedures" and as "paragraphs . . . of this policy." The court
adopts the nomenclature used in the Public Participation Policy and refers to them as "rules and
procedures" or "paragraphs."

On January 5, 2022, the School Committee adjourned the open session to a duly noticed and closed executive session pursuant to Mass. G.L. c. 30A, §§ 21(a), (b). Drolet Aff. ¶ 6 [Doc. No. 16-1]. The executive session was held behind closed doors in the Superintendent's office. Sousa Decl. ¶¶ 5-6 [Doc. No. 62-1]. Sousa arrived at the school building and found the doors locked and the School Committee meeting inside. Id.; Amend. Compl. ¶ 9 [Doc. No. 27]; Amended Answer ¶ 9 [Doc. No. 67]. Drolet reports that Sousa stood outside the windows of the office where the School Committee was meeting, began recording the executive session through the window, and yelled, "Why are we not allowed at the meeting? You cancelled two meetings. Why can't we go?" Drolet Aff. ¶ 7 [Doc. No. 16-1]. Sousa reports that he was engaged in protest outside the windows and did not bang on the windows or scream. Sousa Decl. ¶¶ 7, 19 [Doc. No. 62-1]. School Committee Chair Sluter suspended the meeting and called the Seekonk Police Department. Drolet Aff. ¶ 8 [Doc. No. 16-1].

According to the Seekonk Police Department, Sluter reported that Sousa was yelling and banging on the windows. Amend. Compl. Ex. 4 (Police Report) [Doc. No. 27-4]. The Police Report states further that when the police officer arrived, Sousa denied banging on the windows, and stated that he was yelling because he wanted to know why there was no public speak segment. Id. After the officer reviewed the video taken by Sousa and spoke with Sousa and Sluter, Sousa left the parking lot. Id.

On January 10, 2022, Drolet sent Sousa a letter stating that Sousa had "caused a disturbance during the School Committee's executive session" on January 5, 2022. Amend. Compl. Ex. 5 (January 10, 2022 Letter) [Doc. No. 27-5]; Drolet Aff. ¶ 9 [Doc. No. 16-1]. Drolet advised Sousa that School Committee members were afraid for their safety because of Sousa's conduct and that Drolet was considering issuing a permanent No Trespass Order. Amend.

Compl. Ex. 5 (January 10, 2022 Letter) [Doc. No. 27-5]. On January 18, 2022, Sousa and Drolet met to discuss the incident. Drolet Aff. ¶ 10 [Doc. No. 16-1]. Sousa denied yelling, screaming, or banging on the window. Amend. Compl. Ex. 6 (January 18, 2022 Video) [Doc. No. 27-6] at 5:55-12:30. Drolet stated that School Committee members had felt "threatened," id. at 18:20-18:30, and that the January 10, 2022 letter did not reference the alleged banging or screaming, id. at 3:00-3:08. Drolet advised Sousa that the temporary no trespass order remained in effect. Drolet Aff. ¶ 10 [Doc. No. 16-1].

On January 24, 2022, despite the temporary no trespass order, Sousa attended the School Committee meeting and played his recording of the January 5, 2022 incident during Public Speak. Amend. Compl. ¶¶ 58-66 [Doc. No. 27]; Amend. Answer ¶ 58 [Doc. No. 67]; Amend. Compl. Ex. 14 (January 24, 2022 Video) [Doc. No. 27-14] at 52:05-55:22. Sousa addressed Sluter and asked about the incident. Id. Drolet stated that "people were scared" at Sousa's behavior on January 5, 2022. Amend. Compl. Ex. 14 (January 24, 2022 Video) [Doc. No. 27-14] at 54:43-54:50. After Sousa continued to speak after his Public Speak time had ended, he was asked to leave the meeting. Id. at 54:43-55:40. Drolet lifted the temporary no trespass order in approximately April or May 2022. Drolet Aff. ¶ 11 [Doc. No. 16-1].

On September 26, 2022, Sousa and his wife Kanessa Lynn attended another School Committee meeting. Id. at ¶ 12; Sousa Decl. ¶ 24 [Doc. No. 62-1]. Both Sousa and Lynn spoke during the first Public Speak segment. See Amend. Compl. Ex. 8 (September 26, 2022 Video) [Doc. No. 27-8] at 36:09-39:45. During the second Public Speak segment, after Lynn used her three minutes of allotted time under the Public Participation Policy, the School Committee chair twice indicated that Lynn's time had run. Drolet Aff. ¶ 12 [Doc. No. 16-1]. From the audience, Sousa stated in a loud voice: "I'll wait till my wife's done" and "Then you should have had the

meeting two weeks ago … you're gonna let her talk now!"  Id. at ¶¶ 12-13. A School Committee member moved for a recess and Sousa yelled "No!" and continued calling out comments. Id. at ¶ 13. Drolet asked Sousa to "please leave" the meeting, Sousa refused, and a resource officer escorted Sousa out. Id. at ¶ 14; Sousa Decl. ¶ 25 [Doc. No. 62-1]. After Sousa left, the School Committee resumed the meeting. Amend. Compl. Ex. 9 (Meeting Minutes) [Doc. No. 27-9].

On September 27, 2022, Drolet issued a Notice of Intent to Issue a Permanent No Trespass Order. Drolet Aff. ¶ 15 [Doc. No. 16-1]. On October 3, 2022, Sousa and Drolet met and Sousa denied that he had engaged in unacceptable behavior. Id. at ¶ 16. Drolet discussed the Public Participation Policy, and handed Sousa a copy with paragraphs 2, 7, and 9 highlighted. Sousa Decl. ¶¶ 28-30 [Doc. No. 62-1].

On October 4, 2022, Drolet issued a permanent no trespass order. Amend. Compl. Ex. 13 (Permanent No Trespass Order) [Doc. No. 27-13]. The order prohibited Sousa from entering the Seekonk Public Schools premises and attending school events without permission from Drolet, except that Sousa was permitted to attend parent teacher conferences and back to school nights for his children, who attend Seekonk Public Schools, so long as he gave 48-hours notice. Id.

On November 23, 2022, Drolet issued a Modified No Trespass Order [Doc. No. 41-1], which rescinded the earlier conditions and modified the permanent ban to forbid Sousa from entering Seekonk Public School premises for the purpose of attending School Committee meetings for one year, until November 23, 2023.[3]

---

[3] As a result of this modification, as of November 23, 2022, Sousa is no longer prohibited from picking up his children and attending school events, see Modified No Trespass Order [Doc. No. 41-1].

On December 19, 2022, after the court entered a Temporary Restraining Order that temporarily stayed the Modified No Trespass Order "solely to allow Sousa to attend and speak without being disruptive during his allotted time at Public Speak during the upcoming Seekonk School Committee meeting scheduled for December 19, 2022, subject to the Public Participation Policies [Doc. No. 27-12]," Temporary Restraining Order 7-8 [Doc. No. 54], Sousa attended the December 19, 2022 School Committee meeting and spoke during Public Speak, see Unofficial Transcript [Doc. No. 66].

## II.     Preliminary Injunction Standard

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere

possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Id. at 9 (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

### III.   Likelihood of Success on the Merits

The court considers the likelihood of Sousa's success on the merits as to each claim alleged in his Amended Complaint [Doc. No. 27].

A.   *Plaintiff's Claim that Portions of the Public Participation Policy Violate the First Amendment (Count II)*

Sousa alleges that paragraph 2 and paragraph 9 of the Public Participation Policy are facially unconstitutional, or alternatively, unconstitutional as-applied.[4]

1.   Plaintiff's Facial Challenge

As a threshold matter, Defendants argue that Sousa lacks standing to challenge these provisions, because Sousa was not a recognized speaker at the January 5, 2022, or September 26, 2022 events, and thus cannot show an injury to support a facial challenge. Opp. to Motion for a Preliminary Injunction 8-9 [Doc. No. 82].

The doctrine of standing is drawn from Article III of the Constitution, which confines the federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2; Reddy v. Foster, 845 F.3d 493, 499 (1st Cir. 2017). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting Lujan v. Defs of Wildlife, 504 U.S. 555, 560-61 (1992)). "Although allegations of abstract injury

---

[4] Sousa does not challenge paragraph 7 in the Amended Complaint [Doc. No. 27], but objects in passing that this paragraph also "seems to be erroneously applied against Sousa." Mem. iso Motion for a Preliminary Injunction 11, fn. 11 [Doc. No. 62].

are insufficient to satisfy the first prong of the Article III standing test, a litigant who brings a First Amendment challenge to the face of a statute need not actually violate the statute or suffer the prescribed penalty in order to establish an injury in fact." Ramirez v. Sanchez Ramos, 438 F.3d 92, 98 (1st Cir. 2006). One injury that may suffice "occurs when a 'plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution.'" Id. (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). The second type of injury that may suffice "occurs when a plaintiff 'is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" Id. (quoting N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir.1996)). Where Sousa seeks to speak at future School Committee meetings and claims to be chilled by the two challenged paragraphs, he has standing to mount a facial challenge to the Public Participation Policy.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). The Court has held that "a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) (quoting Washington v. Glucksberg, 521 U.S. 702, 739–740, and n. 7 (1997) (Stevens, J., concurring in judgments)).

Both parties agree that School Committee meetings are limited public forums, which "consist[] of public property which the State has opened for use by the public as a place for expressive activity," but for "a limited purpose such as . . . for the discussion of certain subjects." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45-46 & n.7 (1983). The

government's restrictions on speech in a limited public forum are subject to lesser scrutiny than are restrictions in a traditional or open public forum. Good News Club v. Milford Central School, 533 U.S. 98, 106 (2001). "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009). The "power to restrict speech in such a forum, however, is not without limits." Good News Club, 533 U.S. at 106. In a limited public forum, "the State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminate against speech on the basis of its viewpoint." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995) (internal citations omitted).

The Public Participation Policy here limits speech in a number of ways not challenged by Sousa. For example, speech is limited to two public comment periods of 15 minutes each per meeting, remarks are to be addressed through the Chair of the meeting, and individual speakers are generally allowed no more than three minutes to present their material. Public Participation Policy ¶¶ 1, 3, 5 [Doc. No. 27-12]. These restrictions on speech "are reasonable and viewpoint neutral." See Pleasant Grove City, Utah v. Summum, 555 U.S. at 470. Defendants have an interest in maintaining order at meetings, not only to ensure efficiency in the forum at which they must conduct business, but also to ensure the First Amendment rights of all attendees. See Cox v. State of La., 379 U.S. 536, 554 (1965) ("The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.").

Sousa's first challenge is to paragraph 2, which Sousa contends requires a certain viewpoint that only allows positive commentary and is an impermissibly vague mandate. Mem. iso Motion for a Preliminary Injunction 13 [Doc. No. 62]. Sousa contends further that this paragraph is an impermissibly vague mandate, where it does not give individuals a reasonable opportunity to understand its terms, and allows for arbitrary enforcement by the School Committee. Id. at 14. Defendants respond that paragraph 2 is only "aspirational and does not prohibit or restrict any types of speech." Opp. to Motion for a Preliminary Injunction 13 [Doc. No. 82].

The Public Participation Policy [Doc. No. 27-12] states broadly that the "rules and procedures are adopted consistent with state and federal free speech laws," and specifically in paragraph 2 that "speakers are encouraged to present their remarks in a respectful manner." On its face, the challenged paragraph only "encourage[s]," but does not mandate, speakers to present their remarks respectfully. Accordingly, Sousa has not established a likelihood of success as to the facial challenge to paragraph 2.

Sousa's next challenge is to paragraph 9 as "vague and overbroad." Mem. iso Motion for a Preliminary Injunction 15-16 [Doc. No. 62]. In relevant part, the paragraph states: "Disclaimer: Public Speak is not a time for debate or response to comments by the School Committee." Public Participation Policy [Doc. No. 27-12]. Sousa contends that this paragraph prohibits debate with the School Committee. Mem. iso Motion for Preliminary Injunction 15-16 [Doc. No. 62]. Defendants argue that the paragraph only applies to speech by the School Committee. Opp. to Motion for a Preliminary Injunction 15-16 [Doc. No. 82].

On its face, paragraph 9 is not a prohibition on members of the public; rather, it is a disclaimer that the Public Speak period is not a time for the School Committee to respond to

speakers. Accordingly, Sousa has not established a likelihood of success as to his facial challenge to paragraph 9.

2. Plaintiff's As-Applied Challenge

Sousa also challenges paragraphs 2 and 9 as-applied. See Dahnke–Walker Milling Co. v. Bondurant, 257 U.S. 282, 289 (1921) ("[A] statute may be invalid as-applied to one state of facts and yet valid as applied to another."). Both parties point to the fact that Sousa was not a speaker as defined under the Public Participation Policy. Sousa argues from this fact that this provision should not have been applied to him at all, see Mem. iso Renewed Motion 13 [Doc. No. 29], while Defendants argue that Sousa does not have standing to bring an as-applied challenge where he was not a speaker under the Public Participation Policy, see Opp. to Motion for a Preliminary Injunction 9 [Doc. No. 82].

Where Defendants based the No Trespass Order on Sousa's conduct outside of the Public Speak portion of the meeting, Sousa may challenge how the Public Participation Policy was applied to him. Such challenge, however, is limited to the specific circumstance at issue, namely, that Sousa's conduct for which he has been sanctioned occurred outside of the time when he was a recognized speaker during Public Speak.

The Amended Complaint [Doc. No. 27] lists three incidents for which Sousa claims the Public Participation Policy was applied to him: January 5, 2022, January 24, 2022, and September 26, 2022. The court addresses each incident separately.

Sousa has made no showing that the Public Participation Policy was applied to him with regard to the January 5, 2022 incident. That incident did not occur during the open School Committee meeting, let alone during the Public Speak portion; instead, the conduct that the School Committee objected to occurred while the School Committee was meeting in closed,

12

executive session and Sousa stood outside the locked door and the window of the Superintendent's office. Sousa Decl. ¶¶ 5-7 [Doc. No. 62-1]. Drolet's letters concerning this incident made no reference to the Public Participation Policy or to any public forum. Instead, Drolet charged that Sousa had "caused a disturbance during the School Committee's executive session" when he "approached the windows of where the School Committee was meeting[,] . . . yelled at the individuals present[, and] started recording the executive session." Amend. Compl. Ex. 5 (January 10, 2022 Letter) [Doc. No. 27-5]. Drolet asserted further that "School Committee members were afraid for their safety." Id. Sousa has offered no evidence to support his claim that the Public Participation Policy was applied in any way in connection with that incident.

On January 24, 2022, Sousa spoke during Public Speak, see Amend. Compl. Ex. 14 (January 24, 2022 Video) [Doc. No. 27-14], and was thus subject to Public Participation Policy as a recognized speaker. Sousa was told that all comments must go through the Chair, and then he was told his time was up. After Sousa did not comply with the Chair's directive to stop, he was asked to leave. Id. at 54:43-55:40. Sousa has not demonstrated any application of paragraphs 2 or 9 on this occasion.

Finally, on September 26, 2022, Sousa was not a recognized speaker when the events at issue transpired, specifically when Sousa yelled from the back of the room. As a non-speaker, Sousa was not permitted to comment, and the School Committee was not obligated to tolerate Sousa's actions. As with the January letter, Drolet's September 27, 2022, and October 4, 2022 letters objected to Sousa's conduct outside of the public speak period and made no reference to the challenged paragraphs. Drolet explained that Sousa had "engaged in highly inappropriate and disruptive behavior that required the School Committee to temporarily enter a recess." Amend.

Compl. Ex. 10 (September 27, 2022 Letter) [Doc. No. 27-10]; see also Permanent No Trespass

Order [Doc. No. 27-13] (referring to Sousa's behavior as "inappropriate and disruptive.").

Sousa points to a highlighted copy of the Public Participation Policy that he received

from Drolet when they met on October 3, 2022. Sousa Decl. ¶ 29 [Doc. No. 62-1]. At that

meeting, Sousa denied that he had engaged in unacceptable behavior. Drolet Aff. ¶ 16 [Doc. No.

16-1]. Drolet stated that there were a few "things" that Sousa had broken. Amend. Compl. Ex. 11

(October 3, 2022 Audio) [Doc. No. 27-11] at 4:25-4:45. Drolet continued that "you are

encouraged to present your remarks in a respectful manner, speakers get 3 minutes, unless the

chair determines that you get more." Id. At that point Sousa interrupted him and debated the time

accorded to different speakers. Drolet eventually continued that "what happened the other night

was unacceptable," and that he had highlighted paragraph 7, "that when someone's time runs

out, you don't get extra time," and that from Drolet's perspective, Sousa was "upset" and was

"yelling and screaming because the person before you['s] time ran out and chair was telling her

the time ran out, and then you were yelling and screaming because you were upset about that."

Id. at 5:00-5:24. Sousa conceded that he "got louder," asserting that the Committee members had

stated that they were done with the meeting, and "I wanted to say what I wanted to say," and that

there was information he wanted to know. Id. at 5:40-6:02. Drolet explained that while Sousa

had demanded to know certain information, the procedure was to reach out to the school

principal or Superintendent, and he could give the information he needed, and that under

paragraph 9, Public Speak is "not the time for debate and response." Id. at 6:20-7:18.

In sum, the "unacceptable behavior" as stated by Drolet was Sousa "yelling and

screaming" when another speaker's time had run out. After Sousa sought to justify his conduct

by stating that he wanted certain information, Drolet reiterated the provisions of the Public

Participation Policy that Public Speak was not the time to obtain information and that Sousa

could request that information from the Superintendent or school principal. On this record, Sousa

has failed to demonstrate a likelihood of success on his claim that paragraphs 2 and 9 were

applied to Sousa's conduct on September 26, 2022, when he was not the recognized speaker, let

alone that any such application constituted an as-applied constitutional violation.

Accordingly, Sousa has not sustained his burden to show that paragraphs 2 and 9 are

unconstitutional facially or as-applied such that he is likely to succeed on the merits of his claim.

B.    *Plaintiff's Claim that Defendants Retaliated Against Him Based on a Violation of
the First Amendment and that the No Trespass Order Unlawfully Restricts his
Rights under the First Amendment (Count I)*

Although the Amended Complaint [Doc. No. 27] labels Count I as a claim for retaliation

for First Amendment activity, the allegations are broader: Sousa contends that Defendants

improperly retaliated against him for his conduct on January 5, 2022, and September 26, 2022,

by imposing the Permanent No Trespass Order [Doc. No. 27-13], see Mem. iso Renewed Motion

10 [Doc. No. 29], and further that the restrictions going forward are content-based, viewpoint

discriminatory, and in violation of his First Amendment rights, see id. The court addresses each

claim in turn.

1.    Retaliation Claim

"To make out a prima facie case of retaliation . . . a plaintiff must show that (1) he or she

engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant,

and (3) there was a causal connection between the protected conduct and the adverse action."

D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012). Here, Sousa is likely to be

able to show that the No Trespass Order is an adverse action and that it was based on Sousa's

conduct on January 5, 2022, and September 26, 2022. See Modified No Trespass Order [Doc.

No. 41-1] (stating that the "Order is based on your conduct as set forth in the Notice of Intent

issued to you on September 27, 2022."); Amend. Compl. Ex. 10 (September 27, 2022 Letter) [Doc. No. 27-10] (stating that "during the September 26, 2022 Seekonk School Committee Meeting, [Sousa] engaged in highly inappropriate and disruptive behavior…This is not the first time that you have engaged in such behavior, as you were issued a No Trespass Order last year based on your past behavior at the January 5, 2022 Seekonk School Committee meeting."). However, Sousa is not likely to succeed on the final element of the claim — that his conduct on those dates was protected activity.

Sousa labels his actions outside the Superintendent's window on January 5, 2022, as protected protest. Mem. iso Renewed Motion 10 [Doc. No. 29]. Although "public way[s]" such as sidewalks and public streets are public forums "because of their historic role as sites for discussion and debate," see McCullen v. Coakley, 573 U.S. 464, 476 (2014), Sousa has not sufficiently demonstrated that school grounds right next to the school building are a public forum. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799–800 (1985).

Moreover, even if grounds along the side of a school building were a public forum, as Sousa insists, the right to protection by the First Amendment is not absolute, "since the First Amendment rights must be harmonized with the 'existence of an organized society maintaining public order without which liberty itself would be lost….'" Sullivan v. City of Augusta, 511 F.3d 16, 32 (1st Cir. 2007) (quoting Cox v. State of New Hampshire, 312 U.S. 569, 574, (1941)). A governmental entity may place reasonable time, place, and manner restrictions on speech on such property without violating the constitution. See Ward v. Rock Against Racism, 491 U.S. 781,

791 (1989) (quoting Clark v. Community for Creative Non–Violence, 468 U.S. 288, 293 (1984) ("Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'"). Sousa has made no showing that the School Committee had created a public forum, without any time, place, or manner restrictions, outside the Superintendent's window.

And even if Sousa could show that the lawn outside of the Superintendent's window was a public forum with no time, place, and manner restrictions in place, "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." Cantwell v. State of Connecticut, 310 U.S. 296, 308 (1940). Here, Sluter reported to the police that she was "in fear for her safety" when Sousa was outside the locked executive session of the School Committee meeting on January 5, 2022. See Amend. Compl. Ex. 4 (Police Report) [Doc. No. 27-4]. The School Committee felt compelled to suspend its executive session. Drolet Aff. ¶ 8 [Doc. No. 16-1]. Based on the evidence before the court, Sousa has not sufficiently demonstrated that his speech or conduct on January 5, 2022, was protected under the First Amendment.

With respect to the September 26, 2022 School Committee meeting, Sousa argues that his actions – namely, disrupting the meeting from the back of the room – are protected because the Public Participation Policies are not a valid time, place, or manner restriction. Mem. iso Renewed Motion 12-14 [Doc. No. 29]. Sousa has not shown a likelihood of success on the merits

17

of his claim that his speech – which occurred outside of any period where he was a recognized speaker – was protected. Indeed, even Sousa concedes that "[p]rohibiting someone from testifying at a public meeting because they have disrupted or otherwise interrupted that particular meeting is a '[r]easonable time, place and manner restriction[] on speech in limited public fora.'" Mem. 12 [Doc. No. 29] (quoting Devine v. Village of Port Jefferson, 849 F. Supp. 185, 190 (E.D.N.Y. 1994)).[5]

Accordingly, Sousa has not demonstrated a likelihood of success on his retaliation claim.

2.   Restraint on Future Speech and Participation

The court considers next whether Sousa has demonstrated a likelihood of success on his claim that Defendants' restrictions on Sousa going forward violate his First Amendment rights.[6]

Sousa is unlikely to succeed on any claim that restrictions imposed on him were based on content or viewpoint. Both the Permanent No Trespass Order [Doc. No. 27-13] and the Modified No Trespass Order [Doc. No. 41-1] only reference Sousa's "behavior" and "conduct" at the meeting during times he was not the designated speaker. Nor does the record support any claim that the School Committee seeks to restrain him in the future based on the content of his speech. While Sousa contends that he intended to speak about masks at the School Committee meeting on January 5, 2022, he does not claim that he had in any way conveyed the subject of his

_____

[5]  Sousa contends, however, that under Massachusetts' open meeting laws, his speech cannot be restricted at any given proceeding unless he continues after clear warning from the chair. See Mass. G.L. c. 30A, § 20(g). Sousa's challenge here, however, is under the Constitution, and he has not brought any claim for a violation of the open meeting law. Had he done so, any such claim would be barred, where Sousa has not shown that he has exhausted his administrative remedies under Mass. G.L. c. 30A § 23, which include filing a written complaint to the public body and allowing the body to remedy the alleged violation prior to filing a complaint with the attorney general, or alternatively, initiating a civil action by three or more registered voters.

[6] The Permanent No Trespass Order [Doc. No. 27-13] was rescinded on November 23, 2022, but the Modified No Trespass Order [Doc. No. 41-1] is in effect for a year.

intended speech to anyone. Similarly, Sousa's comments from the back of the room at the September 26, 2022 School Committee meeting made no reference to the content of his wife's speech. Rather, after Lynn used her second Public Speak segment to discuss a book donation without incident, Sousa spoke loudly from the back of the room not about the book, but about wanting his wife to continue speaking past her allotted time and how the School Committee "should have had the meeting two weeks ago." Drolet Aff. ¶¶ 12-13 [Doc. No. 16-1].

Sousa is also unlikely to succeed on his claim that regardless of any past conduct, the School Committee may not restrain him in advance from engaging in disruptive behavior. In his view, the School Committee must allow him to attend each meeting, he may then disrupt the meeting outside of the time when he is recognized for public speak, the School Committee may only then ask him to stop the disruption, and only if he fails to stop after such a request, may he be removed. The court finds no support for this contention that time, place, and manner restrictions that limit speech to a designated time (when recognized as the speaker) may not be enforced without a "free bite of the apple." Quite simply, Sousa is not entitled to an injunction allowing him to continue disrupting School Committee meetings during the period of time when he is not the recognized speaker.[7]

However, to the extent that Sousa is prepared not to speak publicly when he has not yet been recognized as a speaker during Public Speak and after the Chair advises him that his speaking time has concluded, the Modified No Trespass Order's limitation on his attendance at School Committee meetings is overbroad. See Shak v. Shak, 484 Mass. 658, 662, 144 N.E.3d

---

[7] The court does not address here whether the "one free bite of the apple" would apply to speech when an individual is the recognized speaker where the record before the court includes no efforts by the School Committee to limit speech in those circumstances.

274, 279 (2020) (quoting Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 562 (1976) ("To determine whether a prior restraint is warranted, the Supreme Court has looked to (a) 'the nature and extent' of the speech in question, (b) 'whether other measures would be likely to mitigate the effects of unrestrained' speech, and (c) 'how effectively a restraining order would operate to prevent the threatened danger.'").

Accordingly, the Modified No Trespass Order [Doc. No. 41-1] is enjoined only to the extent that it continues to bar Sousa's attendance at School Committee meetings after Sousa or his counsel formally notifies the School Committee that Sousa will abide by the Public Participation Policy's restrictions on public speaking outside of the time he is a recognized speaker during Public Speak. If Sousa or his counsel does not so notify the School Committee, the Modified No Trespass Order remains fully in effect.

      C.      *Plaintiff's Claim that Defendants Violated the Americans with Disabilities Act (Count III)*

Sousa alleges that he has been excluded from participation in School Committee meetings by reason of his bipolar disorder, a symptom of which is loud speech. Am. Compl. ¶¶ 114-117 [Doc. No. 27]. He argues that taking a speaker's volume into account has a disparate impact on Sousa as a qualified disabled individual, and that he was denied a reasonable accommodation to speak loudly. Mem. iso Renewed Motion 16- 17 [Doc. No. 29]. Defendants respond that Sousa does not sufficiently allege that he is a qualified individual with a disability, or that his impairment imposes a substantial limitation on major life activity as required under the Americans with Disabilities Act ("ADA"). Opp. to Renewed Motion 15-16 [Doc. No. 41]. Defendants argue further that even if Sousa could show that pressured speech imposes a substantial limitation, he cannot show that the no trespass order was issued as a result of his disability. Id. at 16.

20

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" 42 U.S.C. § 12132. "The statute authorizes private suits against public entities to enforce its provisions." Toledo v. Sanchez, 454 F.3d 24, 30 (1st Cir. 2006) (citing 42 U.S.C. § 12133). For a claim under Title II of the ADA, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). A "disability" means: "(i) [a] physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) [a] record of such an impairment; or (iii) [b]eing regarded as having such an impairment  . . . ." 28 C.F.R. § 35.108. The term "public entity" includes "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."42 U.S.C. § 12131(1).

Here, Sousa has provided no evidence to support his argument that he has a disability. His counsel asserts that Sousa "suffers from bipolar disorder," see Mem. iso Renewed Motion 16 [Doc. No. 29], but provides no evidentiary support for that claim. The Amended Complaint

[Doc. No. 27] alleges that Sousa has bipolar disorder, but the Amended Complaint is unverified.[8] Sousa filed an Affidavit [Doc. No. 62-1] in support of the motion for preliminary injunction, but made no mention of any disability. Sousa claimed that he is bipolar in his meeting with Drolet, see Amend. Compl. Ex. 11 (October 3, 2022 Audio) [Doc. No. 27-11], but cannot rely on that unsworn, out of court statement to support his claim. In any event, even if he had introduced evidence that he is bipolar, he has offered no evidence of any limitation on any major life activity or other basis for claiming disability. Accordingly, the record does not sufficiently demonstrate a likelihood of success on the merits of Sousa's ADA claim.

  D. *Plaintiff's Equal Protection Claim (Count IV)*

  Sousa alleges that he was singled out for his viewpoints insofar as other speakers at School Committee meetings were not given time limits, removed from meetings by law enforcement, or forbidden from entering school property. Amend. Compl. ¶¶ 122-129 [Doc. No. 27]. Defendants respond that Sousa has failed to identify specific instances in where similarly situated individuals were treated differently. Opp. to Renewed Motion 17-18 [Doc. No. 41].

  "An equal protection claim requires 'proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909–10 (1st Cir. 1995)). "A requirement for stating a valid disparate treatment claim under the Fourteenth Amendment is that the plaintiff make a plausible showing that he or she was treated

---

[8] The original complaint [Doc. No. 1] was verified but did not include the allegation of his disability.

differently from others similarly situated." <u>Est. of Bennett v. Wainwright</u>, 548 F.3d 155, 166 (1st Cir. 2008).

Here, Sousa has not sufficiently demonstrated how he was treated differently compared to those similarly situated. Sousa points to no other persons who engaged in any actions or speech outside of the time as a recognized speaker. <u>See</u> <u>Aponte-Ramos v. Álvarez-Rubio</u>, 783 F.3d 905, 909 (1st Cir. 2015) (holding that although the "formula for determining whether individuals or entities are 'similarly situated' . . . is not always susceptible to precise demarcation," the "test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.") (internal quotations omitted).

With regard to the enforcement of the three-minute limitation, Sousa has made no showing that the number of minutes of speech permitted was based on any impermissible considerations. The court finds the evidence presented wholly insufficient to make any determination in this regard. Accordingly, the court finds that Sousa has failed to demonstrate a likelihood of success on the merits of his equal protection claim.

Because Sousa has not shown a likelihood of success on the merits of his claims, the court does not address the remaining preliminary injunction factors.

**IV.    Conclusion**

Accordingly, Sousa's <u>Renewed Emergency Motion for a Temporary Restraining Order and for a Preliminary Injunction</u> [Doc. No. 28] is DENIED in part and GRANTED in part such that the Modified No Trespass Order [Doc. No. 41-1] is enjoined to the extent that it bans Sousa's attendance at School Committee meetings after Sousa or his counsel formally notifies the School Committee that Sousa will abide by the Public Participation Policy's restrictions on

public speaking outside of the time he is a recognized speaker during Public Speak. Sousa's

<u>Motion for a Preliminary Injunction</u> [Doc. No. 61] is DENIED.

IT IS SO ORDERED.

January 20, 2023                                      /s/ Indira Talwani
                                                     United States District Judge