**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LUIS SOUSA,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>SEEKONK SCHOOL COMMITTEE;<br>RICH DROLET, in his personal and<br>official capacities; KIMBERLY SLUTER,<br>in her personal and official capacities,<br><br>　　　　　　　Defendants. | Civil Action No. 1:22-cv-40120-IT |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR A
PROTECTIVE ORDER**

RANDAZZA | LEGAL GROUP

## TABLE OF CONTENTS

OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER ..........................5

1.0     INTRODUCTION ..............................................................................................5

2.0     FACTUAL BACKGROUND ................................................................................5

    2.1     Sousa and Lynn Protesting Activities..........................................................5

    2.2     Superintendent Drolet Allegations .............................................................7

    2.3     Vice Chair Sluter Allegations.....................................................................8

    2.4     Harassment Against the Sousa Family ......................................................10

3.0     LEGAL STANDARD.........................................................................................11

4.0     LEGAL ARGUMENT........................................................................................12

    4.1     The Defendants are Not Likely to Succeed on the Merits of a Claim under either Criminal Statute Because There is no Probable Cause and no Good Cause to Issue a Protective Order...........................................................................................................12

        4.1.1   Sousa Did Not Commit Witness Intimidation in Violation of 268, § 13B............12

        4.1.2   There Was No "Witness Tampering".................................................................17

        4.1.3   There is No Potential for Irreparable Harm......................................................18

        4.1.4   The Balance of Equities Tips in Sousa's Favor................................................18

        4.1.5   An Injunction Is Not in the Public Interest......................................................19

    4.2     If Anything, the Court Should Issue a Protective Order that Prohibits Emily Field from Harassing the Sousa Family and Remove the Restriction on Sousa Speaking to Others During, Before, or After Meetings. ..............................................................................19

5.0     CONCLUSION .................................................................................................21

CERTIFICATE OF SERVICE................................................................................................22

## TABLE OF AUTHORITIES

**CASES**

*Adler v. Pataki,*
    185 F.3d 35 (2d Cir. 1999) ............................................................................15

*Byrnes v. City of Manchester,*
    848 F. Supp. 2d 146 (D.N.H. 2012) ............................................................14

*Carey v. FEC,*
    791 F. Supp. 2d 121 (D. D.C. 2011)............................................................19

*Chaplinsky v. New Hampshire,*
    315 U.S. 568 (1942) .....................................................................................14

*Commonwealth v. Bigelow,*
    475 Mass. 554 (2016) ...................................................................................13

*Commonwealth v. DePina,*
    2516 CR 3600 (April 29, 2022) ...................................................................16

*Commonwealth v. Frazier,*
    99 Mass. App. Ct. 1120 (2021) .............................................................15, 16

*Commonwealth v. McCreary,*
    45 Mass. App. Ct. 797 (1998) .....................................................................13

*Commonwealth v. Potter,*
    39 Mass. App. Ct. 924 (1995) .....................................................................13

*Elrod v. Burns,*
    427 U.S. 347 (1976) .....................................................................................18

*Higgins v. Pascack Valley Hosp.,*
    307 704 A.2d 988 (NJ Super. Ct. App. Div. 1998) .....................................15

*Kelly v. City of Parkersburg,*
    978 F. Supp. 2d 624 (S.D. W.V. 2013) .......................................................19

*Kilgus v. Cunningham,*
    602 F. Supp. 735 (D.N.H. 1985) .................................................................17

*Lugar v. Edmonson Oil Co.,*
    457 U.S. 922 (1982) .....................................................................................20

*McCarthy v. Fuller,*
    810 F.3d 456 (7th Cir. 2015) .......................................................................19

*Mullin v. Sussex Cnty.,*
    *Del.*, 861 F. Supp. 2d 411 (D. Del. 2012)..................................................19

*O'Brien v. Borowski,*
    461 Mass. 415 (2012) ............................................................................13, 14

*Pierce v. Cotuit Fire Dist.,*
    2013 U.S. Dist. LEXIS 38641 (D. Mass. Mar. 20, 2013) ..........................15

Plaintiff's Opposition to Defendants' Motion for a Protective Order
1:22-cv-40120-IT

*Pullum v. Johnson,*
  647 So. 2d 254 (Fla. 1st DCA 1994) ...................................................................15

*Rissman Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.,*
  2011 U.S. Dist. LEXIS 121426 (D. Mass. Oct. 20, 2011) ....................................12

*Santiago v. Puerto Rico,*
  655 F.3d 61 (1st Cir. 2011)...................................................................................20

*Skinner v. Railway Labor Executives' Assoc.,*
  489 U.S. 602 (1989) ..............................................................................................20

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ..........................................................................................8, 18

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs,*
  60 F.3d 867 (1st Cir. 1995)...................................................................................11

*U.S. v. Colhoff,*
  833 F.3d 980 (8th Cir. 2016) ...........................................................................13, 17

*U.S. v. Gavin,*
  583 F.3d 542 (8th Cir. 2009) ................................................................................17

*United States v. Carmichael,*
  326 F. Supp. 2d 1267 (M.D. Ala. 2004)...........................................................13, 17

*Virginia v. Black,*
  538 U.S. 343 (2003) ..............................................................................................14

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ..................................................................................................12

*Wolfe Fin. Inc. v. Rodgeres,*
  2018 U.S. Dist. LEXIS 64335 (M.D. N.C. April 17, 2018) ..................................19

**STATUTES**

18 U.S.C. § 1512 ..................................................................................................13, 17

G.L. c. 258E..........................................................................................6, 12, 13, 18

G.L. c. 272 ...............................................................................................................9

**RULES**

Fed. R. Civ. P. 26.....................................................................................................12

Fed. R. Civ. P. 65.....................................................................................................12

**OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER**

**1.0     INTRODUCTION**

Sousa and Ms. Lynn (a non-party) have been protesting in Seekonk for several months. Not once in the Defendants' motion do they mention *protesting*, as it is their desire to create a false narrative to try and censor this protesting, with this Court's imprimatur on such censorship. The Defendants also cropped evidence in a misleading manner. As this Opposition will show, it is the Defendants that are harassing the Sousa Family, and not vice versa.

**2.0     FACTUAL BACKGROUND**

**2.1     Sousa and Lynn Protesting Activities**

The Defendants claim that there is "no other apparent purpose" for Sousa and his wife ("Lynn") to drive on Water Lane other than to threaten Defendant Rich Drolet. (Mot. at 11). Meanwhile, in their zeal to try and create a false narrative, they make up a bizarre theory that someone driving past a building is "threatening" behavior.  They do not like the signs on the car as it drives by, but the fact that those being protested do not like the protest signs is no reason for an injunction against protesting activity.

Sousa and Lynn have been protesting the Defendants for the last several months. The Defendants cropped Lynn's Facebook post to conceal that Sousa and Lynn have been protesting. *Compare* Doc. No. 96-43 with **Exhibit 1**. *See also* **Exhibit 23**, Declaration of Robert J. Morris II ("Morris Decl") at ¶ 4.  The actual Facebook posts states that Sousa and Lynn "[f]or almost 3 weeks . . . were protesting outside the administration building." *Id.*  Why did the Defendants crop the exhibit, and why did they hide the protesting activities from this Court?

The Defendants' purpose in filing their Motion is to harass and intimidate Sousa and Lynn from exercising their First Amendment Rights. This is part of a larger pattern by the Defendants to silence their perceived detractors.  The Defendants tried to conceal crucial facts and context in

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

an effort to now enlist the Court in their campaign against the First Amendment. The Defendants'
Motion is worthy of sanctions. Sousa requests this Court order the Defendants to cover the cost
that he had to expend to defend against this frivolous motion.

If the Defendants truly believed they were in danger, they could have filed for a harassment
prevention order in Massachusetts state court pursuant to G.L. c. 258E, § 3. But, their allegations
would not meet the standards under Massachusetts law. If the Defendants truly believed they were
in danger, they would not have waited until the end of January to seek this injunctive relief.[1]

On November 18, 2022, Lynn advertised the protest on Facebook: "Peaceful protest
weekdays outside Aitken Elementary School on Newman Ave from 2:50-3:30. Then across from
Hurley Middle School on Newman Ave from 3:35-4:00. Drive by and honk in support or stop by
and hold a sign." **Exhibit 2**. *See also* Morris Decl. at ¶ 5.  On November 21, 2022, Lynn posted a
picture on Facebook that had the sign "FIRE Superintendent DROLET He's Banning Parents" on
the side of their vehicle. **Exhibit 3**. *See also* Morris Decl. at ¶ 6.  On November 22, 2022, Lynn
posted an "emotional support board" of her husband, Sousa, as part of a protest. **Exhibit 4**. *See
also* Morris Decl. at ¶ 7.  On December 12, 2022, Lynn posted a video about "how obsessed people
in this town had become of me and my family. They're flying a drone over us to watch us protest
outside the school."[2] **Exhibit 5**. *See also* Morris Decl. at ¶ 8. On December 15, Lynn posted a
picture of Sousa protesting outside with a sign that says "FIRE Superintendent DROLET He's
Banning PARENTS." **Exhibit 6**.  *See also* Morris Decl. at ¶ 9.  On December 23, 2022, Lynn
posted a picture of Sousa protesting while dressed up as the Grinch. **Exhibit 7**.  Morris Decl. at ¶
10.

---

[1] The law of this case is that a delay of two weeks is fatal to seeking injunctive relief. Doc. No. 11.
[2] In the video, a drone is flying above Sousa and Lynn and monitoring them while they are
protesting. *See* https://www.facebook.com/100002675914208/videos/1802443190136566/.

Plaintiff's Opposition to Defendants' Motion for a Protective Order
1:22-cv-40120-IT

From November to January, Lynn has documented her protesting activity on Facebook. Defendants were aware of this because they admit to stalking her social media. *See* Affidavit of Bridget McNamara, Doc. No. 96-3 at ¶ 3-6; *See also* Affidavit of Kimberly Sluter, Doc. 96-4 at ¶ 6. Some people enjoy the Sousa Family's protesting, *see* **Exhibit 8**,[3] while others are against it, *see* **Exhibit 9**, **Exhibit 10**, **Exhibit 11**.[4] But, undeniably, protesting is a fundamental First Amendment activity, and the Sousa's protests have contributed to Seekonk's marketplace of ideas.

## 2.2    Superintendent Drolet Allegations

On December 9, 2022, Confidential Secretary Bridget McNamara was informed that Sousa and his wife were observed operating a vehicle on Water Lane.[5] Doc. No. 96-3, at ¶ 2. According to McNamara, Sousa and his wife ("Lynn") were observed on surveillance footage engaging in similar activity on three other occasions. *Id.* McNamara obtained some surveillance footage of a white vehicle driving on a public road. *Id.* While these parties complain about the content on signs on the side of the car elsewhere, they pretend that they have no idea why anyone would drive by a building with protest signs on the car, except to potentially do someone harm. Clearly, this is a false narrative.

McNamara, presumably at the direction of her boss, Defendant Drolet, admitted to monitoring (stalking) Lynn's Facebook account since at least October 3, 2022. *Id.* at ¶¶ 3-6. Therefore, it should not be a surprise to McNamara, nor Drolet, that Sousa and Lynn would drive on the road by Hurley Middle School, *because they go to the area to protest*.

---

[3] *See also* Morris Decl. at ¶ 11.
[4] *See also* Morris Decl. at ¶¶ 12-14.
[5] The Defendants appear to have begun their plan to weaponize their surveillance system against Sousa and Lynn around the same time that this Court ruled that there was a factual dispute regarding whether Sousa banged on the windows on January 5, *see* Doc. No. 55 at 19:11-21:2, and when Sousa filed his motion for adverse inference regarding whether he banged on the windows on January 5 because surveillance video was deleted, *see* Doc. No. 64.

Plaintiff's Opposition to Defendants' Motion for a Protective Order
1:22-cv-40120-IT

On January 5, 2023, apparently Drolet was leaving Hurley Middle School in afternoon, while at the same time Sousa and Lynn were driving on Water Lane. Apparently, Sousa and Lynn drove in the same direction as Drolet for approximately one mile. *See* Affidavit of Richard Drolet, Doc. No. 96-1 at ¶ 11; Affidavit of George Kelleher, Doc. 96-2 at ¶ 7.  It is notable that Seekonk is 18.32 square miles.  It has one main avenue, Arcade Avenue, going north to south. **Exhibit 27**. In a town of this size, it is inevitable that two people will be on the one main road in town at least one time, simultaneously.  Happening to be on the same road, one time, in a small town is evidence of nothing.[6]

### 2.3     Vice Chair Sluter Allegations

Defendant Sluter also monitors Lynn's Facebook account. *See* Doc. 96-4 at ¶ 6.  On January 2, 2023, Sluter became aware that Lynn posted on Facebook signs that stated "Kim Sluter Is A F-ing LIAR" and "FIRE Superintendent DROLET He's Banning Parents." *Id.* at ¶ 6. These signs were put on Sousa and Lynn's vehicle to protest and petition. *Compare* Doc. No. 96-45 with **Exhibit 12**. *See also* Morris Decl. at ¶ 15. It is unclear who sent the picture to Sluter through text message, but it was not Sousa or Lynn. Doc. No. 96-45.  Lynn posted the picture on Facebook and within three hours, Sluter was made aware of the Facebook post by a third-party.  Neither Sousa nor Lynn has ever sent any of their social media posts to any of the Defendants. *See* **Exhibit 24**, Declaration of Luis Sousa ("Sousa Decl.") at ¶ 12. The Defendants voluntarily visit Lynn's social media and they have others monitor Lynn's social media for them.

On January 4, 2023, the Defendants demanded, through counsel, that Sousa and Lynn remove the sign protesting Sluter from their vehicle. **Exhibit 13**. *See also* **Exhibit 25**, Declaration

---

[6] However, simply speaking hypothetically, even if the Sousas purposely followed Drolet for a mile, so that he could see their signs, as long as they did not otherwise create a safety issue, this would be completely lawful.  *See Snyder v. Phelps,* 562 U.S. 443, 457 (2011).

of Marc J. Randazza, at ¶ 4.  Around the same time, on January 4, 2023, Drolet sent a letter to Lynn regarding her recording of a Committee meeting. **Exhibit 14**. *See also* **Exhibit 26**, Declaration of Kanessa Lynn ("Lynn Decl.") at ¶ 4.  Despite knowing that she had been given permission to record, Drolet falsely accused Lynn of violating the wiretapping statute under G.L. c. 272, § 99 and demanded that she remove a recording of the Committee meeting from her Facebook account under the threat of criminal prosecution. *Id*.

On January 5, 2023, Sousa and Lynn received an email from Aitken Elementary School Principal Gaf threatening to "sanction" them if they did not remove the signs protesting Sluter and Drolet from their vehicle. **Exhibit 15**. *See also* Lynn Decl. at ¶ 5.  By the time this email was received, and because of the threat of criminal prosecution (or further unconstitutional conduct) from Drolet, the sign protesting Sluter was changed from "Kim Sluter is a F-ing LIAR" to "Kim Sluter is a Slimy LIAR." **Exhibit 12**.  Both signs are First Amendment protected speech, but it is worth noting that Sousa did change his sign to remove "F-ing" (literally).

Notably, Superintendent Drolet threatened Lynn on January 4, and Principal Gaf threatened the Sousa Family on January 5. There are no allegations in the Defendants' Motion concerning **any** conduct by Sousa or Lynn after January 5. However, the Defendants waited an additional 20 days before filing the present motion requesting injunctive relief.  The Court will recall that 15 days' delay was deemed to be fatal to Sousa's initial request for injunctive relief. Doc. No. 11. However, that delay was the time it took a layperson to understand their rights had been violated, shop around for an attorney, retain one, and to have a request for injunction filed.  In this case, the Defendants are already well-lawyered up.  Unless some delays are more equal than others, this alone should result in the injunctive relief being denied.

### 2.4 Harassment Against the Sousa Family

McNamara, Drolet, and Sluter are not the only ones stalking Lynn's social media. This began, at least, on September 16, 2021.

On September 16, 2021, the Seekonk Committee Chair Erin Brouillette looked up Lynn's Instagram account and attempted to follow her. Sousa Decl. at ¶ 4; **Exhibit 16**.[7] Lynn responded by declining the request and sending her a respectful message. *Id*. About an hour later, Brouillette's friend requested to follow Lynn as well. Sousa Decl. at ¶ 5.  Again, Ms. Lynn responded by declining the request. *Id*.

In April 2022, Emily Field ran for election to the Seekonk School Committee. Sousa and Lynn were supporting two other candidates. *Id.* at ¶ 6. Emily Field appears to have directed her best friend's husband to stalk Lynn's Facebook and Snapchat, sending screen shots of Lynn's posts to her. *Id.* at ¶ 7.

Emily Field won her election.  Emily Field serves on the Seekonk School Committee. On October 24, 2022, Sousa, Lynn, and their children came straight to a town meeting from a Halloween party. *Id.* at ¶ 8; **Exhibit 17**. *See also* Morris Decl. at ¶ 16.  The Sousa Family was still wearing their Halloween costumes. Emily Field stood behind the Sousa Family and began harassing Lynn over her costume. Sousa Decl. at ¶ 8; **Exhibit 18**. *See also* Lynn Decl. at ¶ 7. Emily Field took pictures of Lynn in her Halloween costume, including focusing on her gluteus maximus. Sousa Decl. at ¶ 8.  Lynn felt humiliated and sexually harassed by Emily Field. *Id*.

On January 23, 2023, right before the Committee meeting, Emily Field told a meeting attendee that she was excited because people would be coming to the Committee meetings in mass to "bully the bully," referring to the Plaintiff. *Id.* at ¶ 9; **Exhibit 19**. *See also* Lynn Decl. at ¶ 8.

---

[7] *See also* Lynn Decl. at ¶ 6.

Plaintiff's Opposition to Defendants' Motion for a Protective Order
1:22-cv-40120-IT

This very Court made it clear that nobody is allowed to *so much as speak to others before or after the gavel, nor any other time except when at the microphone during Public Speak*. **Exhibit 22** at 46:18-51:16; 60:24-62:15. This Court entered a conditional injunction, requiring Sousa to specifically agree to this term. Doc. No. 93. However, at the very next meeting, the Committee suspended this rule, at least for anyone who is not Mr. Sousa.  During the January 23 Committee meeting, there was a disturbance by an attendee, who had not been recognized by the Chair, while Lynn was returning to her seat. Sousa Decl. at ¶ 10; **Exhibit 20**. *See also* Lynn Decl. at ¶ 9.  The disturbance was by Emily Field's cousin, and Emily Field can be seen laughing in the video during the disturbance. *Id.* No action was taken by the Chair or Drolet for this disturbance, despite this Court order requiring *Sousa* to formally notify the Committee that he will abide by the Public Participation Policy's restrictions on public speaking outside of the time he is a recognized speaker. Doc. No. 93 at 24.  It appears that the Defendants are no longer enforcing this policy, or only applying it to Sousa.  Moreover, Emily Field has had other family members threaten Lynn through social media. Sousa Decl. at ¶ 11.  On January 27, 2023, Emily Field's nephew sent a threatening message to Lynn through Instagram. **Exhibit 21**.  *See also* Lynn Decl. at ¶ 10.

To call the Defendants hands "unclean" when seeking this injunctive relief would be an insult to the concept of uncleanliness. *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.").

## 3.0   LEGAL STANDARD

The Defendants are seeking a gag order so broad that it would cover any discussion of the case. The Defendants couch their Motion in "cease and desist" language but what they are asking for is an injunction.  If the Court were to grant this "protective" order, it would prohibit Sousa

from exercising his First Amendment Rights to protest and petition. It is dishonest for the Defendants to fail to present to this Court that Sousa has been protesting them, or to address how Sousa's protesting activities would be affected by their proposed order.

The Defendants are seeking a prior restraint on Sousa's ability to protest. For the Defendants to obtain this unconstitutional government overreach, they must meet the standards under Fed. R. Civ. P. 65. *See Rissman Hendricks & Oliverio, LLP v. MIV Therapeutics, Inc.*, 2011 U.S. Dist. LEXIS 121426, at *14-15 (D. Mass. Oct. 20, 2011) (analyzing a motion for protective order based on allegations of witness intimidation under Fed. R. Civ. P. Rules 26(c) and 65). The test for granting an injunction is (1) whether there is a likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Moreover, even if this Court were to evaluate a protective order under Fed. R. Civ. P. 26(c), there is no good cause to issue a protective order against Sousa, and there is no jurisdiction to enjoin his wife from exercising her First Amendment Right to protest. The appropriate remedy for the Defendants is to pursue a harassment prevention order in the Massachusetts state court, *see* G.L. c. 258E, § 3, or to file a police report if they wish to prohibit Sousa or non-parties to this lawsuit from engaging in First Amendment protected conduct.  Such efforts would fail there, as they should here – but at least that would be the proper procedure.

**4.0    LEGAL ARGUMENT**

**4.1    The Defendants are Not Likely to Succeed on the Merits of a Claim under either Criminal Statute Because There is no Probable Cause and no Good Cause to Issue a Protective Order.**

**4.1.1    Sousa Did Not Commit Witness Intimidation in Violation of 268, § 13B**

The elements for Witness Intimidation are (1) willfully, either direct or indirectly; (2) threatening, attempting, or causing physical, emotional, or economic injury or property damage to

… or misleading, intimidating, or harassing another person; (3) who is a witness or potential witness; and (4) with the intent to or with reckless disregard for the fact that it may impede, obstruct, delay, prevent, or otherwise interfere with a civil proceeding, or to punish, harm or otherwise retaliate against any such person described in this section for such person or such person's family members participation in any of the proceedings. G.L. c. 268, § 13B.

The statute defines "harass" as "to engage in an act directed at a specific person or group of persons that seriously alarms or annoys such person or group of persons and would cause a reasonable person or group of persons to suffer substantial emotional distress . . . ." *Id.* at § 13B(a). Though the term "intimidates" is not defined by the statute, "the essence of intimidation is fear." *Commonwealth v. Potter*, 39 Mass. App. Ct. 924, 926 (1995); *see also Commonwealth v. McCreary*, 45 Mass. App. Ct. 797, 799 (1998) (superseded by statute on unrelated grounds) (noting that intimidation is "putting a person in fear for the purpose of influencing his or her conduct").

Application of the statute is restrained by the Constitution. "In considering the First Amendment's protective reach, 'critical' to the examination is the context . . . of the speech at issue." *Commonwealth v. Bigelow*, 475 Mass. 554, 562 (2016). In *O'Brien v. Borowski*, 461 Mass. 415, 425 (2012), the SJC confined the definition of "harassment" under G.L. c. 258E to the constitutionally unprotected categories of fighting words and true threats. "Harassment" in G.L. c. 258E expressly includes violations of Section 13B. Similarly, the federal witness intimidation statute, 18 U.S.C. § 1512, is limited to constitutionally unprotected speech such as true threats. *U.S. v. Colhoff*, 833 F.3d 980, 984-85 (8th Cir. 2016); accord *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1279 (M.D. Ala. 2004). Thus, Section 13B must be similarly restricted to only unprotected speech of fighting words or true threats. Sousa was not alleged to utter either.

"'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). As in *O'Brien*, "the 'true threat' doctrine applies not only to direct threats of imminent physical harm, but to words or actions that -- taking into account the context in which they arise -- cause the victim to fear such harm now or in the future and evince intent on the part of the speaker or actor to cause such fear." 461 Mass. at 425. The "fighting words" exception "is limited to words that are likely to provoke a fight: face-to-face personal insults that are so personally abusive that they are plainly likely to provoke a violent reaction and cause a breach of the peace." *Id*. at 423. Such provocation must be <u>immediate</u>. *See Byrnes v. City of Manchester*, 848 F. Supp. 2d 146, 157 (D.N.H. 2012) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942)).

Regarding Drolet, the Defendants claim that Sousa "surveilled him" and that constitutes witness intimidation in violation of G.L. c. 268, § 13B. (Mot. at 10).  The Defendants' allegations are baseless. Sousa has not engaged in any behavior that could remotely qualify as harassing, intimidating, or threatening.  Drolet may have felt annoyed that Sousa was protesting outside his workplace, but voicing negative opinions of a government official without any implication of physical violence or contact does not constitute fighting words. *O'Brien*, 461 Mass. at 429.  And there was nothing that constitutes a true threat, as Drolet could not have had a reasonable apprehension of physical violence. His stated concerns are either mere paranoia or they are concocted over-dramatization.   Neither turns innocuous conduct into "intimidation" or "harassment." Sousa did not make any statements that could reasonably be construed as a threat to engage in violence. Sousa and Lynn have been engaged in protesting, not harassment and intimidation. *See* **<u>Exhibits 1-12</u>**.

With respect to Sluter, Lynn (again, a non-party) calling Sluter a "fucking cunt" on social media is beneath the undersigned's dignity, but it remains absolutely protected speech. "The First Amendment requires neither politeness or fairness." *Pullum v. Johnson,* 647 So. 2d 254, 258 (Fla. 1st DCA 1994). Further, Lynn's speech cannot be attributed to Sousa. *Pierce v. Cotuit Fire Dist.,* 2013 U.S. Dist. LEXIS 38641, at *19-20 (D. Mass. Mar. 20, 2013) ("I note that the Second Circuit has recognized that adverse action against one spouse based solely on conduct of the other spouse may violate a First Amendment right of intimate association. *Adler v. Pataki,* 185 F.3d 35, 44 (2d Cir. 1999). Lynn is her own person. And for the Defendants to suggest otherwise is a sexist stereotype of a man somehow controlling or owning his spouse. Sousa did not use any profanity on school grounds. Initially, the sign said that "Sluter is a F-ing LIAR." When the Defendants threatened criminal prosecution for it, the sign was changed from "Sluter is a F-ing LIAR" to "Sluter is a Slimy LIAR," and the Defendants were still not happy. **Exhibit 13**. "The First Amendment 'does not embrace the trite wallflower politeness of the cliche that if you can't say anything good about a person you should say nothing at all.'" *Higgins v. Pascack Valley Hosp.,* 307 704 A.2d 988, 1002 (NJ Super. Ct. App. Div. 1998) (quoting Rodney A. Smolla, Law of Defamation, § 6.09[2], at 6-37 (1986)). What the Defendants really want is for Sousa and Lynn to stop protesting. This is an unconstitutional desire, and this Court should not satisfy it.

The Defendants' allegations of witness intimidation under G.L. c. 268, § 13B would never survive probable cause to pursue a criminal case. In *Commonwealth v. Frazier*, 99 Mass. App. Ct. 1120, *1 (2021) the appellate court reversed the trial court's motion to dismiss for lack of probable cause. The appellate court ruled the record before them was "inadequate to support a conclusion as a matter of law, that the defendant's conduct was not a true threat." *Id.* The Defendants fail to

explain how *Frazier* supports their argument. The appellate court would have upheld the ruling in *Frazier* if there was a complete record.

  The Defendants allegations do not satisfy the elements for witness intimidation.  How do Sousa's actions, as alleged towards Drolet, satisfy the elements for witness intimidation? How do Sousa's actions, as alleged towards Sluter, satisfy the elements for witness intimidation? The Defendants do not and cannot explain.  Instead, they conflate Sousa and Lynn as one person, and they conflate Drolet and Sluter as one person. Sousa exercised his First Amendment Rights to protest government officials, and his conduct did not constitute fighting words or true threats.

  In *Commonwealth v. DePina*, 2516 CR 3600 (April 29, 2022), the trial court dismissed a charge for intimidation under G.L. c. 268, § 13B for lack of probable cause, finding that the defendant's conduct was "within the First Amendment's protective reach."[8]  In *DePina*, the defendant repeatedly disrupted the Suffolk County District Attorney during a televised press conference.[9] The prosecutors' theory of the case was that DePina made indirect references to other criminal cases that were pending against him; thereby, intimidating the prosecutor. There was no probable cause, and the trial court dismissed the case against DePina. Similarly, there is no probable cause to pursue witness intimidation charges against Sousa, and no good cause to issue a protective order that would infringe on Sousa's First Amendment right to protest.

---

[8] M. Reed, *Charge dropped against man who heckled Suffolk County District Attorney Rachael Rollins during press conference*, WCVB5, May 25, 2022, (accessed Feb. 2, 2023), https://www.wcvb.com/article/charge-dropped-against-man-who-heckled-suffolk-county-district-attorney-rachael-rollins-during-press-conference/40104998.

[9] E. Boehm, *He Heckled a District Attorney on TV. Now He Faces 10 Years Behind Bars*, Reason, May 21, 2022, (accessed Feb. 2, 2023), https://reason.com/2022/05/24/he-heckled-a-district-attorney-on-tv-now-he-faces-10-years-behind-bars/.

Plaintiff's Opposition to Defendants' Motion for a Protective Order
1:22-cv-40120-IT

### 4.1.2    There Was No "Witness Tampering"

The elements for Witness Tampering are (1) knowingly using intimidation, threats, or corruptly persuading another, or attempting to do so, or engaging in misleading conduct toward another person; and (2) with the intent to influence, delay, or prevent the testimony of any person in an official proceeding.  18 U.S.C. § 1512 (b)(1). The federal witness intimidation statute, 18 U.S.C. § 1512, is limited to constitutionally unprotected speech such as true threats. *U.S. v. Colhoff*, 833 F.3d 980, 984-85 (8th Cir. 2016); accord *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1279 (M.D. Ala. 2004).

Defendants' reliance on *U.S. v. Gavin*, 583 F.3d 542, 547 (8th Cir. 2009) is misplaced.  In *Gavin*, the court observed that to establish a violation of witness tampering under 18 U.S.C. § 1512(a)(2)(A), the government must prove a defendant used or threatened physical force with the intent of curtailing a witness from testifying.  *Id.* None of those elements are present here:  there was no use of force, no threat, and no intent.

Defendants' reliance on *Kilgus v. Cunningham*, 602 F. Supp. 735, 739 (D.N.H. 1985) is also misplaced. There, the defendant induced another person to testify falsely to police officers. *Id.* at 737. After discovering that officers were conducting a murder investigation, the third-party admitted he was not on the plane. *Id.*  The Defendants do not explain how Sousa's conduct meets the elements for witness tampering. By the Defendants own reasoning, their Motion for a Protective Order could constitute a violation, as could their refusal to lift the no trespass order. Sousa never threatened violence against any of the Defendants, and he has not asked any Defendant or potential witness to falsely testify.[10]  Defendants present misleading evidence to this Court to portray Sousa and Lynn as intimidating.  *Compare* Doc. 96-43 with **Exhibit 1**.  Defendants

---

[10] In fact, Sluter maintains to this day the lie that Sousa "banged on the windows."  Tellingly, they have not (and presumably will never) swear to this under penalty of perjury.

cropped Lynn's Facebook post to conceal that Sousa and Lynn were outside, on a public sidewalk (a public forum), protesting. There is no reasonable explanation for why the Defendants concealed evidence, and this Court should not abide this lack of candor. The Defendants would not be the first government officials to dislike a protest outside their building, but it is Sousa's right to do so. The Supreme Court has identified only "a few limited situations where the location of targeted picketing can be regulated under provisions that the Court has determined to be content neutral." *Snyder v. Phelps,* 562 U.S. 443, 457 (2011) (identifying the home and abortion clinics).

### 4.1.3   There is No Potential for Irreparable Harm

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Sousa's First Amendment right to protest is at stake.  There is no potential for irreparable harm (nor any harm) to the Defendants. They waited several weeks to file their Motion filled with baseless allegations and half-truths. The Defendants have recourse to protect themselves by filing a police report or pursuing a harassment prevention order, if they sincerely believe that their rights are being violated. However, as explained above, there is no probable cause for any criminal allegations that the Defendants have alleged, and their claims are insufficient to obtain a harassment prevention order pursuant to G.L. c. 258E, § 3. Moreover, the Defendants have not explained, even based on their purported allegations, how Sousa or Lynn's activity has impacted the proper functioning of the present case.  They just don't want to be protested.  Period.

### 4.1.4   The Balance of Equities Tips in Sousa's Favor

Granting the requested injunction would infringe upon Sousa's First Amendment rights. The Defendants suffer no harm by this Court denying their request for an injunction.

### 4.1.5   An Injunction Is Not in the Public Interest

The public interest "favors protecting First Amendment rights." *Kelly v. City of Parkersburg*, 978 F. Supp. 2d 624 (S.D. W.V. 2013); *see also Carey v. FEC*, 791 F. Supp. 2d 121, 135-36 (D.D.C. 2011). Moreover, the unconstitutional request by the Defendants has the potential to harm Lynn, a nonparty to this case because it would limit or infringe upon her First Amendment rights. *See Wolfe Fin. Inc. v. Rodgeres*, 2018 U.S. Dist. LEXIS 64335, at *49 (M.D. N.C. April 17, 2018) (*citing McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015).

**4.2    If Anything, the Court Should Issue a Protective Order that Prohibits Emily Field from Harassing the Sousa Family and Remove the Restriction on Sousa Speaking to Others During, Before, or After Meetings.**

On January 23, 2023, three days after this Court ordered that Sousa must formally notify the Committee that he "will abide by the Public Participation Policy's restrictions on public speaking outside of the time he is a recognized speaker during Public Speak," Doc. No. 93 at 24, there was a disturbance while Lynn was returning to her seat, *see* **Exhibit 20** at 0:35. The disturbance was caused by Emily Field's cousin and was an attempt to intimidate, embarrass, and harass the Sousa Family. Sousa Decl. at ¶ 10. Unlike Sousa, however Emily Field admitted that this was her motive. *Id.* at ¶ 9; **Exhibit 19**. Emily Field, a Committee member, used her position as an elected official to orchestrate a campaign to bully the Sousa Family. *Id.* This is part Emily Field's pattern.  She has had other friends and family members stalk, harass, and threaten the Sousa Family. Equity demands that Emily Field be prohibited from further harassing the Sousa Family.[11]

---

[11] Plaintiff's counsel has met and conferred with opposing counsel on this issue, and Plaintiff intends to file a counter-motion. However, we are waiting a few more days to resolve the issue. It is undignified for the Defendants to target Sousa and his Family for harassment during Committee meetings and outside of Committee meetings. The Defendants have yet to explain why they failed to act to quell the disturbance during the January 23 Committee meeting that directly targeted the Sousa Family.

In April 2022, during the school committee elections, Emily Field had her friend's husband stalk Lynn's social media, and send her comments about it. Sousa Decl. at ¶ 7. In October 2022, Emily Field mocked and sexually harassed Lynn by standing behind her and taking a picture of her backside. *Id.* at ¶ 8; **Exhibits 17-18**. Additionally, through this Motion, Sousa has now been made aware that Drolet and his secretary have been surveilling his wife's social media accounts. Doc. No. 96-3, at ¶ 3-6. This stalking and harassment of the Sousa Family by the Defendants is frankly far worse than anything alleged by the Defendants. Soon after the January 23 Committee meeting, her nephew sent a threatening message to Lynn through Instagram. **Exhibit 21.**

Emily Field is having agents act at her direction to harass, intimidate, and stalk the Sousa Family.  The Joint Action doctrine applies when the government acts jointly with a private party. In a situation like this, when private conduct is "fairly attributable to the State," it is a joint action. *See Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)).  When the government does "more than adopt a passive position toward the underlying private conduct" it is deemed to be acting jointly with these private individuals. *See Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 614-15 (1989).

On January 23, 2023, when the disturbance occurred during the Committee meeting, the Chair took no action to quell the disturbance. **Exhibit 20** at 0:35-0:44. Drolet took no action to either. The disturbance was meant to harass Lynn. Emily Field, along with other Committee members, can be seen laughing.  The Committee is no longer enforcing a policy that restricts people from public speaking outside of the time they are recognized during Public Speak. In fact, they are encouraging, endorsing, and ratifying the harassment of their opponents.

Accordingly, if this Court entertains the Motion, then this Court should modify the Order issued on January 20, 2023, to lift the restrictions that seemingly only apply to Sousa, not as general

policies against such disturbances. Moreover, this Court should sanction the Defendants and order them to pay the cost that Sousa expended to defend their baseless Motion, and order Emily Field to stop harassing the Sousa Family.

**5.0    CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Defendants' Motion.

Dated: February 8, 2023.            Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
Robert J. Morris, II (*pro hac vice*)
rjm@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

Attorneys for Plaintiff
Luis Sousa

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2023, foregoing document was served on all parties or

their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza